# PROFESSIONAL SERVICES

# SUBSCRIPTION AGREEMENT



A UNIFIED CRIME REDUCTION PROGRAM

for

CITY OF
1699
OCEAN SPRINGS

Provided by: SECURIX, LLC

**EXHIBIT 1**

THIS AGREEMENT including the attached exhibits (herein called The Agreement) is made and entered into this 19th day of May 2021 or date of last signing by and between Police Chief Mark Dunston of the CITY of OCEAN SPRINGS, a municipal corporation of the State of Mississippi, having his principal office at 3810 Bienville Blvd., Ocean Springs Mississippi 39564 hereinafter the "CITY", **and,**

SECURIX, LLC, a Delaware COMPANY with its address being 3379 Peachtree Road, Suite 555, Atlanta, Georgia 303026, ("COMPANY"). Both CITY and COMPANY may each be referred to individually as "Party" and collectively as "Parties. This agreement sets forth the terms, conditions, and obligations of the Parties.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter contained and subject to the terms and conditions hereinafter stated, it is hereby understood and agreed as follows:

WHEREAS COMPANY has exclusive knowledge, possession and ownership of certain equipment, technology, licenses and processes in a three (3) part system known as SECURIX Monitors, ANNIE Insurance Status Network and SAFE STREET Violation Processing, all referred to collectively as the SECURIX Public Safety Support System and, the SECURIX Company itself and all elements collectively herein, as "COMPANY"), **and,**

WHEREAS CITY desires that the COMPANY, which shall operate as a wholly-owned subsidiary known as "Mississippi Public Safety Company" and be headquartered in Mississippi to support all Mississippi municipalities in this State using this service to provide all requirements necessary, on behalf of CITY, to monitor and enforce mandatory vehicle insurance, and issue and collect on Notices of Liability for violations and may in the future also on behalf of the CITY monitor and enforce other compliance violations and issue Notices of Liability or later, Citations as decided and directed by CITY and accordingly, to further serve CITY as the Parties determine and document.

WHEREAS, CITY has authorized and wishes to contract with COMPANY to provide services to implement and operate elements of this Public Safety Support Program for mandatory vehicle insurance enforcement and identification of stolen and other vehicles identified as potentially involved with criminal activity, including the provision and use of certain equipment, processes and back office services; the attached Exhibits include:

> Exhibit A...............SCHEDULE OF REVENUE PROVIDED
> Exhibit B................SCOPE OF WORK - COMPANY
> Exhibit C...............SCOPE OF WORK – CITY
> Exhibit D...............NOTICE TO PROCEED

By signing below, the Parties agree to the terms and conditions of this Agreement including the attached exhibits. This Agreement contains the complete and exclusive statement of agreement between the Parties relating to all matters referenced herein and replaces any prior oral or written representations or communications between them. Each individual signing below represents that he has the requisite authority to execute this Agreement on behalf of the entity which he represents and that all the necessary requirements to do so are met.

**ACKNOWLEDGED AND AGREED BY:**
**SECURIX, LLC**

_City of Ocean Springs_
**CLIENT**

By: _____ Date: May 27, 2021
Jonathan Miller, Director and Chairman
SECURIX, LLC

By: _____ Date 5/27/2021

This Agreement is effective on the date of execution by the last signatory to this document, (effective date).

# CONTENTS

|  | GENERAL TERMS AND CONDITIONS | 3 |
|---|---|---|
| 1 | SCOPE OF WORK | 3 |
| 2 | TERM | 3 |
| 3 | ASIGNMENT | 3 |
| 4 | FEES AND PAYMENT | 3 |
| 5 | SITE SELECTION ANALYSIS AND NOTICE TO PROCEED | 4 |
| 6 | CONFIDENTIAL INFORMATION | 4 |
| 7 | OWNERSHIP | 5 |
| 8 | INDEMNIFICATION AND INSURANCE | 6 |
| 9 | REPRESENTATIONS AND WARRANTIES | 6 |
| 10 | APPLICABLE STATE LAW AND DISPUTE RESOLUTION | 7 |
| 11 | CHANGE ORDERS | 7 |
| 12 | TERMINATION | 8 |
| 13 | CONFLICT OF INTEREST | 9 |
| 14 | LEGAL CONSTRUCTION | 9 |
| 15 | DEFINITIONS | 9 |
| 16 | PRIOR AGREEMENTS INVALID | 10 |
| 17 | NO AGENCY | 10 |
| 18 | FORCE MAJEURE | 10 |
| 19 | TAXES | 11 |
| 20 | GENERAL PROVISIONS | 11 |
| 21 | NOTICES | 11 |
| EXHIBIT A | SCHEDULE OF FEES | 9 |
| EXHIBIT B | SCOPE OF WORK – COMPANY | 10 |
| EXHIBIT C | SCOPE OF WORK – CLIENT | 13 |
| EXHIBIT D | NOTICE TO PROCEED | 16 |

1. **SCOPE OF WORK**

> **COMPANY agrees to provide:** The **Scope of Work** as detailed in **Exhibit "B"**
> **CITY agrees to provide:** The **Scope of Work** as detailed in **Exhibit "C"**

2. **TERM**

The contract shall be in full force and effect upon the signature date herein. The initial term of the agreement shall be four (4) years and it shall automatically extend for additional three (3) year terms unless CITY provides written notification prior to 90, (ninety) days prior to date of termination. COMPANY shall provide CITY a written notice of renewal 120 (one hundred and twenty), days prior to the end of each active term so the City may evaluate its renewal options. Notwithstanding, either Party may terminate this agreement at any time by providing a ninety (90) day advance written notice to the other party. In the event COMPANY should receive a written notice of cancellation from CITY within the first 60, (sixty) days of contract signing, COMPANY will remove equipment and cease operations without cost of any kind to CITY. If COMPANY receives a written notice of cancellation from CITY afterwards but within 365 days of the contract signing, CITY will reimburse to COMPANY within 30 days of CITY's receipt, the expenses incurred by COMPANY therefrom the contract's beginning date through the date of final cancelation of all documented costs associated with actual field equipment purchases and then unpaid Change Orders if any, but not services or any other system element or service that occurred during that period. A written notice of cancellation must be sent from one party to the other via Certified Mail, Return Receipt Requested, or, by Overnight Delivery with proof of signature required.

3. **ASSIGNMENT**

Neither party may assign all or any part of this agreement without prior written consent of the other. Consent shall not be unreasonably withheld or delayed. However, this shall not prohibit assignments by operation of law (such as mergers) and corporate transactions involving the sale of all or substantially all of the assets of COMPANY. COMPANY may sell, assign, transfer or convey any interest in this contract in whole or in part without consent of the CITY. CITY would however, retain the right to terminate at any time and for any reason without penalty.

4. **FEES AND PAYMENT**

COMPANY shall be paid for all the services based on schedule: **Exhibit A, "Schedule of Fees".**

4.1 COMPANY is contracted with Certified Payments and, CITY will also contract with an authorized Certified Payments to collect all payments from violators electronically on-line and transfer the funds collected to COMPANY and CITY in equal shares as herein documented and agreed, and also provide complete and accurate records for proper reconciliation of Parties. COMPANY commits that revenues will be provided directly to CITY's account(s) daily along with full accounting and complete reconciliation and that further, as many accounts and payment recipients as CITY directs will be paid in this manner.

4.2 While this system's main focus is crime reduction, not revenues, this agreement is also intended to provide new revenues to the CITY that are currently unavailable and also unconnected to any form of tax or fees.

4.3 This system is to otherwise be revenue neutral. Except as otherwise expressed in this Agreement, It is not anticipated that there will be any requests for additional work to be provided by COMPANY but if such additional work is requested by CITY and agreed and documented by the Parties, COMPANY will not seek to bill or collect from CITY, more revenue than was collected the previous month(s). If for any reason, fees for additional work requested by CITY and agreed by the Parties exceed revenue, excess fees will be deferred by the COMPANY until such time as collections catch up, then invoiced to the CITY. That said, at no time shall CITY be required to pay COMPANY directly any funds whatsoever other than in these specific instances, if any, and then only at CITY's option. If contract Is terminated, CITY will owe COMPANY no funds other than COMPANY's share of revenues from uncollected notices as such notices are paid by violators over the following ninety, (90) days and these funds due referenced above if indeed, any exist.

4.4 After at least three documented requests for payment to violator by COMPANY and at least 120 days of attempts to collect yet, failure to obtain such payment, COMPANY will initiate collection efforts for delinquent notices only with CITY's documented approval. If so instructed to provide this service, COMPANY will be entitled to charge violator a delinquent collection fee. The fee will be 30% of collections in addition to COMPANY's standard fees outlined in **Exhibit A, Schedule of Payments.** This shall apply only to then-collected funds from these subsequent attempts to obtain payment. COMPANY shall receive such funds only if paid by violator and on condition that CITY is also paid half of the actual fee amount. This additional 30% referenced above shall in no way impact any funds due to CITY.

5. **SITE SELECTION ANALYSIS AND NOTICE TO PRODEED**
Prior to implementing this system, COMPANY will conduct an analysis of sites being considered. Sites could be located on either public or private property. COMPANY will choose sites that allow for the most expeditious and cost-effective installation. COMPANY will install system units on sites recommended by the CITY, only if, after traffic analysis, the COMPANY concludes the installation Is feasible and commercially viable. COMPANY makes no representations or warranties that any violation rate estimates will be predictive of the actual future violation rate and subsequent collections. Under no conditions can sites chosen then be used at any time to target specific neighborhoods or intersections and the only criteria is traffic counts and certain school protection zones.

Execution of this agreement shall serve as the CITY's Notice to Proceed (NTP) as set forth in **Exhibit D**. During the term of this agreement CITY may expand system by providing COMPANY with additional written NTPs as is mutually agreeable without the need to amend this agreement.

6. **CONFIDENTIAL INFORMATION**
All information given by COMPANY to CITY will be considered of a confidential nature, unless specifically designated in writing as non-proprietary and non-confidential by the COMPANY. Provided however, nothing in this paragraph shall be construed as contrary to the terms and provisions of any "Open Records Act" or similar laws insofar as they may be applicable. COMPANY shall not use any information acquired by this program, which begins with transfer of images to servers under law enforcement control, with respect to any violations or the CITY's law enforcement activities, for any purpose other than this program.

All information given by CITY to COMPANY will be considered of a confidential nature, unless specifically designated in writing as non-proprietary and non-confidential by the CITY. Provided however, nothing in this paragraph shall be construed as contrary to the terms and provisions of any "Open Records Act" or similar laws insofar as they may be applicable. CITY shall not use any information acquired by this program, which begins with transfer of images to servers under law enforcement control, with respect to any violations or the COMPANY's law enforcement support activities, for any purpose other than crime reduction efforts.

Confidential Information may not be directly or indirectly, copied, reproduced, or distributed by the party receiving the Confidential Information except to the extent necessary for the receiving party to perform under the terms of this Agreement and then, only for the benefit of the party disclosing the Confidential Information. The party receiving Confidential Information may not, directly or indirectly, sell, license, lease, assign, transfer or disclose the Confidential Information of the disclosing party, except as allowed under the terms of this Agreement or upon written consent of the disclosing party.

7. **OWNERSHIP**

It is understood and agreed by CITY that the system being installed by the COMPANY is and shall remain the sole property of the COMPANY. All creations developed either wholly or partly by COMPANY pursuant to this Agreement, including all intellectual property rights therein, shall be owned by COMPANY. All rights, title, and interest in and to the concepts, methodologies, processes, techniques, inventions and tools, (including computer hardware and software where applicable), that COMPANY uses to produce deliverables or perform Services under this Agreement, other than elements owned specifically by CITY, (to include the actual data itself), shall remain the property of COMPANY, the System is being provided to the CITY only under the terms and for the term of this specific subscription agreement. All images are provided to CITY. Images are property of COMPANY prior to enhancing and matching with government-provided Alert Hot Lists or being transmitted to servers under law enforcement control, after which, images become and remain CITY property.

Parties agree that the goal of this system must at all times be seen as public safety support and in the case of vehicle insurance, reducing the number of uninsured vehicles in use. Parties agree that although revenues will be reduced over time as a result of increased compliance and lower recidivism, the contact details of those vehicle owners who have failed to pay, appear or, in any other manner honor their obligations under the law, will be made available as contacts in a database to be provided to insurers who, then aware the vehicle(s) are in use and clearly identified as non-compliant, may wish to contact such violators to encourage insurance sales and as a consequence, help reduce the uninsured vehicle rate. COMPANY shall make all arrangements, maintain this information in a database that has no connection to that/those of CITY and cover all costs involved. COMPANY, not CITY, will handle all requirements and absorb all cost in both initiating and maintaining this database but, to cover such costs, will charge those insurers that wish access to it, a small fee to cover those costs.

8. **INDEMNIFICATION AND INSURANCE**

The COMPANY shall comply with all laws, ordinances and regulations governing the use of LPR, (license plate recognition), systems applicable to this agreement and shall comply with the maintenance procedures and manufacturer's recommendations for operation of the SECURIX, (Company) equipment, which affects this

agreement, and shall indemnify and save harmless the CITY against claims arising from violations of maintenance procedures and manufacturers' recommendations for operation of equipment as a result of willful misconduct of the COMPANY, its officers and directors, agents, attorneys and employees but excluding any agents or employees of the CITY.

COMPANY is a service provider acting only as agent of government but shall obtain and maintain at all times during the term of this agreement, at its sole cost and expense, the following insurance:

8.1 Commercial General Liability Insurance with a minimum limit of $1,000,000 per occurrence. Coverage shall be written on an ISO Occurrence form CG 00 01 1001 or a substitute form providing equivalent coverage. All insurance required to be carried by Contractor shall be issued by a COMPANY licensed to conduct business in the State of Mississippi rated by A.M. Best with a minimum Class "IX" or higher as to financial rating and "A" (Excellent) as to policyholder rating.

8.2 Workers Compensation as required by applicable state law and Employer's Liability insurance with limits of not less than $500,000 each accident. The COMPANY shall at all times maintain workers compensation insurance coverage in the amounts required by law but shall not be required to provide such coverage for actual or statutory employees of the CITY.

8.3 Comprehensive Business Automobile Liability Insurance for all owned, non-owned and hired automobiles and other vehicles used by The COMPANY with a minimum of $50,000 per occurrence combined single limit bodily injury and property damage.

8.4 The CITY shall be responsible for vehicle insurance coverage on any vehicles driven by its employees.

## 9. REPRESENTATIONS AND WARRANTIES

9.1 COMPANY warrants that it has full authority to enter into this agreement.

9.2 CITY warrants that it has full authority to enter into this agreement.

9.3 CITY accepts and pledges its continued use of a state-unified enforcement systems along with other law enforcement agencies, to share and exchange license plate data, to enable enforcement, processing and adjudication of motor vehicle compliance violations in CITY's jurisdiction.

9.4 COMPANY shall perform all services under this Agreement on a professional "best efforts" basis and, in a workmanlike and expeditious manner.

9.5 All undisputed obligations owed to third parties with respect to the services to be provided by the COMPANY under this Agreement and subsequent Change Orders are/will be satisfied by COMPANY.

9.6 The COMPANY will provide support, repair and maintenance for any design defect or other failure(s) in COMPANY-provided equipment and software from date of delivery to the CITY and, for any errors, malfunctions, glitches, viruses or other problems in the design, function and performance of the COMPANY's property or CITY's property provided by COMPANY undiscovered, undiscoverable of unknown at the time of delivery to the CITY, which later became known.

10. **APPLICABLE LAW AND DISPUTE RESOLUTION**

All disputes arising out of or in connection with the Agreement shall be attempted to be settled through good faith negotiation between senior management of both parties, followed if necessary within thirty (30) days by professionally assisted mediation.

In the event of any question or dispute arising between the parties as to the interpretation of any term or condition of this Agreement, or with respect to any matter of compliance or non-compliance with the terms of this Agreement, resolution shall be governed by the Laws of the State of Mississippi and be heard in Chancery Court, Jackson County, without regard to conflict of laws provisions.

11. **CHANGE ORDERS**

The CITY may from time to time consider it in its best interest to change, modify or extend the term, conditions or covenants of this Agreement or require changes in the scope of the services to be performed by the COMPANY, or request the COMPANY to perform additional services regardless of and without invalidating the process that was used to procure the services enumerated in this Agreement.

Any such change, addition, deletion, extension or modification, including increase or decrease in the amount of COMPANY compensation that has been mutually agreed upon by and between the CITY and COMPANY shall be incorporated in written amendments (herein called "Amendments") to this agreement. In the event that any proposed change includes the addition of new sites to be covered by the terms of this agreement, COMPANY will provide best efforts to absorb all associated costs If however, Parties agree that there shall be an additional charge, then pricing terms set forth in **Exhibit A** shall govern. Such Amendments shall not invalidate this agreement nor mitigate obligations herein.

    11.1 The CITY may request the addition of any products or services that the COMPANY provides or other changes to the **Scope of Work** to be performed under this agreement by providing the COMPANY with written Change Order Notice.

    11.2 Upon receipt, if COMPANY determines that it can provide such services or products without additional charge it will notify CITY and then provide such products and services. If an additional cost(s) is involved, the COMPANY shall first deliver a written statement (estimate) including, time and materials known as the Change Order Proposal.

    11.3 Following receipt of the COMPANY's Change Order Proposal, the Parties shall negotiate in good faith regarding the plan and schedule of implementation of the proposed changes. The time, manner and amount of payment or price increases and any other matter relating to the proposed changes in the event that any proposed change involves addition of equipment or services, the fees shown in **Exhibit A** shall govern.

    11.4 Any failure to reach an agreement with respect to the foregoing regarding the proposed changes shall not be deemed to be a breach of the Agreement.

    11.5 COMPANY pledges to do all possible to avoid the use of Change Orders and provide products and services whenever and however possible, without charge or delay. If however, after agreeing to the scope of work outlined in Notice to Proceed, additional and currently unscheduled work is requested by CITY, and

if agreed and fully mutually documented and performed and, CITY does not willingly absorb all related costs, then COMPANY reserves the right at its sole discretion to invoice CITY the agreed sum and CITY agrees to pay same net 30 terms.

## 12. TERMINATION

The COMPANY's services may be terminated:

12.1 By mutual written consent of the parties.

12.2 By either Party at any time and without cause providing ninety days advance written notice.

12.3 For Cause by either party where the other party fails in any material way to perform its obligations under this Agreement. Termination under this subsection assumes the Parties wish to continue services but seek to correct problems and this is then subject to the condition that the terminating party notifies the other party of its intent to terminate stating with reasonable specificity the grounds for termination, and that the other party fails to cure the default within thirty (30) days after receiving the notice.

12.4 Upon termination of this Agreement by mutual agreement, for no cause, for cause or, because it has reached the end of its term and not been renewed, the Parties recognize that the CITY must continue handling violations that are currently "in the pipeline", and that the COMPANY must assist with processing those notices in this regard. Accordingly, the Parties shall take the following actions and shall have the following obligations which shall survive termination during the wind-down period:

- CITY shall cease using the SECURIX System to capture violations.
- COMPANY shall continue to process all images taken on behalf of CITY and provide customary services in accordance with the Agreement through the final date of termination.
- COMPANY shall be able to collect any (differed) unpaid fees due from the CITY from "Pipeline" Notice fees.
- COMPANY shall continue to receive Notice payments in its Certified Payments Portal for as long as outstanding notices continue to be paid and Certified Payments will continue to forward such payments to Parties daily.
- CITY shall return or allow COMPANY to recover equipment within a reasonable time not to exceed sixty, (60) days.

## 13. CONFLICT OF INTEREST

The Company represents that it does not employ an officer or employee of the City of Ocean Springs in connection with this Agreement and shall adhere to the Code of Ethics of the City and with the provisions of the General Municipal Law of the State of Mississippi. COMPANY may in future, contract with City Law Enforcement Officers if approved by CITY, to assist with system but will never interfere with their discretion.

## 14. LEGAL CONSTRUCTION

In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions herein. This Agreement shall be construed as if the invalid, illegal or enforceable provision has not been contained herein and the Agreement shall be otherwise enforced to the maximum extent possible. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

## 15. DEFINITIONS

a. "Confidential Information" means information of either COMPANY or Client which is disclosed under this Agreement in oral, written, graphic, machine recognizable, electronic, sample or any other visually perceptible form by one to the other, and which is considered to be proprietary or a trade secret by the disclosing party. Confidential Information of COMPANY expressly includes, without limitation, the Software, Workflows, Processing Systems and Documentation. The Confidential Information of CITY includes, without limitation, any and all government-provided data and most especially once probable cause has been determined without the use of names and addresses, the then personally-identifiable information needed to contact potential violators and later, status including adjudication and reporting. Confidential Information shall not include information which the party receiving the information can document : (i) was in the possession of or known by it without an obligation of confidentiality prior to receipt of the information, (ii) is or becomes general public knowledge through no act or fault of the party receiving the information, (iii) is or becomes lawfully available to the receiving party from a third party without an obligation of confidentiality , or (iv) is independently developed by the receiving party without the use of any Confidential Information.

b. "CITY Content " means all images and data sent to CITY and not to COMPANY  and also, data, information, documents, and file uploads or inputs into the COMPANY Vault and Veridicus Systems or any other systems of COMPANY, including, without limitation, any Personally Identifiable Information sent.

c. "Enhancements" means any specific configurations or customizations to the Software, which CITY may request and COMPANY agrees in writing to provide.

d. "Documentation" means any operating instruct ions, specifications and other documentation related to the operation, description and function of SECURIX and COMPANY operations or the Service provided by COMPANY whether supplied in paper or electronic form.

e. "Intellectual Property" means any patents , patent applications, copyrights, mask works, trademarks, service marks, trade names, domain names, inventions, improvements, (whether patentable or not), trade secrets, Confidential Information, moral rights, and any other intellectual property rights.

f. "Personally Identifiable Information" means any information that may be used to identify specific persons or individuals, which is collected by either COMPANY or CITY for use in conjunction with the use of the systems of COMPANY.  Personally-Identifiable Information shall be considered Confidential Information.

g. "Diversion Management", (as described at diversionmanagement.com), is the case management system used by COMPANY in support of CITY.

h. " Service" means the non-compliant vehicle identification, law enforcement verification, insurer verification, processing, printing and mailing, monitoring, Notice of Liability and Citation systems, collections, subsequent verification and reporting, hosting, violator reminders, evidence support package creation and notification platform provided by COMPANY which allows a secure delivery and notification mechanism for CITY.

i. "Service Level Requirements" means the technical service levels COMPANY shall meet for Services as set forth below in the Service Level Commitments for the delivery of said services.

j. "Software" means the Client's licensed copy of the application in support of CITY, the nine separate verification and processing elements used by COMPANY in support of CITY and includes any and all updates, enhancements, underlying technology or content, law enforcement and court transfer interfaces, other Enhancements and any Documentation as may be provided to the CITY by COMPANY.

## 16. PRIOR AGREEMENTS INVALID

This Agreement constitutes the sole and only agreement of the Parties and supersedes any prior understanding, written or oral, between the Parties.

## 17. NO AGENCY

The COMPANY is an independent contractor providing services to the CITY. The employees, agents and contractors of the COMPANY shall in no event be considered to be the employees, agents or contractors of the CITY. This contract is not intended to create an agency relationship between the COMPANY and the CITY other than that COMPANY has authority to conduct itself as Agent of CITY regarding the specific tasks detailed in this contract but no others.

## 18. FORCE MAJEURE

As noted in Section 8., above, neither party will be liable to the other or be determined to be in breach of this Agreement for any failure or delay in rendering performance arising from causes beyond reasonable control other than its fault or negligence. Such causes may include but are not limited to: Acts of God terrorism, fires, floods, earthquakes, epidemics, quarantine restrictions, strikes, freight embargos, unusually severe weather, or governmental authority's approval delays which are not caused by any act or omission by the COMPANY. Most especially, neither Party shall be required to perform any installment obligation hereunder for the period of time that is directly or indirectly prevented by delays of vendors or suppliers, or any other cause whatsoever beyond the reasonable control of either Party. The Party whose performance is affected agrees to notify the other promptly of the existence and nature of the delay.

## 19. TAXES

CITY will provide any forms necessary to establish COMPANY's tax-exempt status and submit them to the local tax authorities. Under no conditions however, will CITY have any responsibility for fees, tax or other of the COMPANY's financial or potential financial responsibilities and if not accepted by tax authorities, COMPANY alone remains fully responsible, never CITY.

## 20. GENERAL PROVISIONS

a. ASSIGNMENT. This Agreement will inure to the benefit of and be binding upon COMPANY and CITY's respective successors and assigns.

b. MODIFICATION AND WAIVER; SEVERABILITY. Any modifications of this Agreement must be in writing and signed by both parties. A waiver by either party of a term or condition will not be deemed a

waiver of any other or subsequent term or condition. Should any court of competent jurisdiction determine that any term or provision of this Agreement is unenforceable or otherwise invalid, the offending term or provision will be modified to the minimum extent necessary to render it enforceable. If such modification is not possible, the term or provision will be severed from this Agreement with the remaining terms to be enforced to the fullest extent possible under the law.

21. <u>CORPORATE COMPLIANCE AND ADDITIONAL COMMITMENTS:</u>

COMPANY hereby acknowledges its responsibility to comply with any and all applicable Rules and Statutes and further that it complies fully with: Medicaid false claims and whistleblower protection under the Federal Deficit Reductions Act of 2005, the New York State General Municipal Law Section 103-g entitled "Iranian Energy Sector Divestment", pursuant to Section 165-a (3) (b) of the State Finance Law, all sections and provisions of Section 103 of the General Municipal Law. COMPANY further commits that it is in full compliance with State Labor Law Section 201-g entitled "Prevention of Sexual Harassment" and shall contract with no party that is not and further commits that it is at all times in compliance with its written policy addressing sexual harassment prevention in the workplace and will provide training which meets the State Department of Labor's model policy and training standards, to all employees on at least an annual basis. Indeed, COMPANY acknowledges that any person signing on behalf of COMPANY certifies under penalty of perjury, that we have implemented a written policy addressing sexual harassment prevention training to all employees that exceeds the requirements of Section 201–g of the New York State Labor Law (NYS Labor Law §201-g). No sub-contractors are or will in future, be involved with performance of services to Prosecutor and thus, that is not a consideration. COMPANY will at all times be in compliance with Articles 8 and 9 of the State Labor Law in general, but also specifically with regard to –Prevailing Wage and Supplements and that it is the COMPANY's obligation to perform in accordance with the above referenced articles. We understand and will comply with any changes in this matter as may be amended by the State Department of Labor regarding the Prevailing Wage Rate Schedule. Company is and at all times will remain in compliance with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CPR Part 21. COMPANY further commits to fully honor and implement policies in support of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects); the Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq.),* (prohibits discrimination on the basis of sex); Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq),* as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27; the Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq.),* (prohibits discrimination on the basis of age); Airport and Airway Improvement Act of 1982, (49 USC § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex); The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964; the Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and Companies, whether such programs or activities are Federally funded or not); Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 1213 1-1 2 1 89) as implemented by Department of Transportation regulations at 49, C.P.R. parts 37 and 38. COMPANY further commits compliance with the Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex); Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, which ensures discrimination against minority populations by discouraging programs, policies, and activities with disproportionately high and adverse human health or environmental effects on minority and low-

income populations; Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, and resulting agency guidance, national origin discrimination includes discrimination because of limited English proficiency (LEP). To ensure compliance with Title VI, COMPANY will take reasonable steps to ensure that LEP persons have meaningful access to the programs (70 Fed. Reg. at 74087 to 74100); Title IX of the Education Amendments of 1972, as amended, which prohibits discrimination due to because of sex in education programs or activities (20 U.S.C. 1681 et seq).

Notwithstanding that COMPANY has and shall have no employees or contractors working in the City, it specifically agrees, as required by the provisions of the Labor Law, Section 220-e, as amended, that the COMPANY will also comply with the provisions of Section 291-299 of the Executive Law and the Civil Rights Law and the Governor's Code of Fair Practice, and any amendments and rules and regulations pursuant thereto, and will furnish all information and reports deemed necessary by the State Division of Human Rights under the Law, and will permit access to its books, records and accounts by the State Division of Human Rights, the Attorney General and the Industrial Commissioner for the purpose of investigation to ascertain compliance with the non-discrimination clauses, the Executive Law and Civil Rights Law and Company further warrants that it is in and will remain in compliance with the Americans with Disabilities Act (Public Law 101-336) and that it will, in carrying out the requirements of this Agreement, comply in all respects with the provisions of the Act and its implementing regulations.

## 22. NOTICES

NOTICES. Any notices provided under this Agreement will be in writing in the English language and will be deemed to have been properly given if delivered personally or if sent by (i) a recognized overnight courier , (ii) certified or registered mail, postage prepaid, return receipt requested, or (iii) facsimile, if confirmed by mail. COMPANY's address for such notices is set forth below. CITY's address for such notices will be the address on file with COMPANY as provided by CITY if not listed below. Such address or contact information may be revised from time to time by provision of notice as described in this Section. All notices sent by mail will be deemed received on the tenth (10th) business day after deposit in the mail. All notices sent by overnight courier will be deemed given on the next business day after deposit with the overnight courier. All notices sent by facsimile will be deemed given on the next business day after successful transmission. Where possible, sender should obtain tracking info from carrier and signature or delivery information shall be considered "proof of delivery" to the Parties. Notices should be sent to the parties at the following addresses:

**Address of COMPANY:**

SECURIX, LLC
Attn: Mike McGrey, Director and Secretary
3379 Peachtree Road, Ste. 555
Atlanta, Georgia 30326

**Address of CITY:**

City of Ocean Springs
Attn: Chief Mark Dunston
3810 Bienville Blvd.
Ocean Springs Mississippi 39564

## EXHIBIT "A" SCHEDULE OF PAYMENTS

Based on a Fee of $300.:

| Type | Description | Fees/ Charges |
|------|-------------|---------------|
| 1.0 | In regards to any ALPR equipment connected to this system and owned by CITY, if any, the CITY is to be reimbursed any and all maintenance and licensing costs so as to ensure it has no related budget concerns during the contract period. All elements connected via COMPANY's "Connect 2 Enforce" System shall have no cost to CITY other than the normal "unchoked" wireless charges and, this shall be for all units in the system as only law enforcement can so contract with carriers. That said, all new future purchases during the term of this agreement regarding modems or other wireless connectivity devices are the responsibility of the COMPANY. | **Percentage of Revenues from Paid Notices of Liability or Citations** |
| | Both CITY and COMPANY are to each receive Fifty Percent (50%), of all revenues collected from violators. Distribution is to be made daily and automatically with full reconciliation records to Parties by Certified Payments. | |
| | COMPANY is to reimburse CITY for continued service fees charged by others regarding ongoing software, hardware and communications maintenance on an agreed schedule to be made a part of this agreement. COMPANY shall provide, at no cost to CITY, necessary interfaces, additional communications equipment, and all related necessary equipment and, shall absorb all such cost, including installation, initialization, and all permits, engineering and maintenance. Details of equipment and related costs to be made an Attachment of this agreement and this Agreement is conditional upon acceptance of such Attachment by the Parties. COMPANY shall also pay, regarding linked equipment now in the field owned by CITY and if connected and all ongoing maintenance, as noted above, despite which CITY shall continue to have full control over and own the data created. | |
| 2.0 Interstate Notices Only OPTIONAL | **Service Charge per Interstate Notice – Interstate Violator to Pay** Service Charge includes incremental cost associated with processing and handling Notices issued to Out-of-State Violators and, is added as a service charge to violator. | $10.00 each Notice – CITY does not pay |
| 3.0 NO CHARGE - Media Support, Dedicated Net Sites, Full Color Brochures, etc. | COMPANY will provide CITY with suggested monthly media releases, a Mississippi-specific internet site detailing privacy protections, the Privacy Impact Assessment, and system results and, it will also provide both a limited number of color brochures, maps and instruction guides and will also print and mail at its own expense, clearance confirmations to any violator requesting one. | Included |

| 4.0 As Negotiated OPTIONAL Change Order Support | COMPANY has no information that would lead it to believe that change orders might be necessary but assuming there are issues and require-ments raised by CITY, COMPANY pledges to support and handle such needs at cost and fully document each requirement, professionally quote and then obtain approval in advance of any work so approved by CITY. | At Cost and as Properly Documented |
| --- | --- | --- |

## EXHIBIT B: SCOPE OF WORK- COMPANY

### 1. IMPLEMENTATION

COMPANY will provide to the CITY a COTS, (Commercial Off-the Shelf), turnkey solution for automatically identifying both those vehicles that are or may be associated with illegal conduct a determined by linkage to government-provided lists of such vehicles, such images and information to be provided to CITY only, not COMPANY and also, those vehicles so identified also noted as potentially uninsured as also identified by government-provided information but in some cases, also insurer-provided information, and the COMPANY is also responsible for processing and communications of all types and also providing support to both government and violators/potential violators and collecting fees associated with operating such uninsured vehicles on the CITY's roadways, using COMPANY's proprietary vehicle insurance verification system. All necessary elements required to implement and operate the system are the responsibility of the COMPANY except for those items identified in **Exhibit "C" Scope of Work – CITY**. Operations of same and all associated costs are the sole responsibility of COMPANY.

Although not anticipated and understood that anything dealing with the COMPANY's commitments herein must be provided without cost to CITY, it is however understood and agreed that new or previously unforeseen requirements may from time to time be identified and that the Parties shall negotiate in good faith to assign the proper Party responsibility and cost for such items should they occur. In general, if work is documented herein to be performed by the CITY, then the CITY may not charge the COMPANY for the cost involved and if work documented herein is to be performed by COMPANY, then COMPANY may not charge CITY for the cost involved. All other unspecified contract requirements are the responsibility of the COMPANY.

1.1 CITY and COMPANY shall create and agree on a Project Timeline within thirty (30) days of the effective date of this Agreement and within 15 days of the completed analysis of sites proposed on the Notice to Proceed. Project Timeline will include analysis of feasibility and commercial viability of proposed sites in Notice to Proceed and priority, timing and order in which selected sites will become operational.

1.2 Once Project Timeline is established, Parties will make every effort to adhere to the timeline and not cause undue delays.

1.3 If CITY has existing ALPR system(s) and wishes, they may subscribe to COMPANY's **"Connect 2 Enforce"** System. This is detailed in **Exhibit "A."** Each camera has a unique record of images captured, those processed, and then, those paid. COMPANY will provide a monthly record of each to support invoicing if such invoicing is agreed and, which can be separate for ALPR units owned by CITY and, those owned by COMPANY. COMPANY can support a system which uses ALPR entirely owned by CITY, partially-owned by CITY or, which CITY has no ownership whatsoever. In all cases, COMPANY will support and pay for maintenance and licenses for those CITY-owned cameras it has agreed access and use of and is copied with images created along with relevant date and time stamp. COMPANY will process and further obtain

additional data such as make/model/year, state of registration, color, etc. at its own expense unless already part of data provided by CITY. Under no conditions will CITY pay for or ever be expected to pay for, the provision of images to COMPANY.

1.4  COMPANY will operate each system on a 24/7/365 basis barring downtime for maintenance & normal servicing. COMPANY will perform maintenance on a routine schedule.

1.5  COMPANY will repair any non-functioning system in the earliest possible time frame except in cases of Force Majeure as outlined herein or in the event that the system element is the property of CITY. In that case, COMPANY will notify CITY within 24 hours of the system element failure and assist CITY in monitoring the issue and report when the system element is returned to active use or replaced. If a unit connected to the COMPANY System, the cost for such repair and maintenance will be paid by COMPANY.

## 2. COMPANY OPERATIONS

2.1 COMPANY will provide CITY with a turn-key, automated web-based insurance non-compliance detection, notice and collection system including a complete Notice/Citation assurance system, Officer-controlled access and discretion in determining probable cause, image processing, printing and mailing of original notices and Suspension or other Notices if original Notice remains unpaid and/or there is no evidence to support proof of service and, the collection and distribution of fines and all reporting.

2.2 COMPANY will produce and use a standardized Notice or Citation form approved by an officer also approved by the CITY and under his/her Officer's electronic signature to inform vehicle owners of detected non-compliance. Notice or Citation will include all details agreed by Parties and provide a period of not more than 45 days from the original detection of non-compliance so that the vehicle owner may, if desired, contest charge or show proof of compliance, if applicable.

2.3 COMPANY shall obtain in-state vehicle registration information necessary to issue notices in its role as CITY's agent, at no cost to CITY but will require approval of and assistance from CITY to obtain same.

2.4 COMPANY shall seek records from out-of-state vehicle registration data bases and incorporate records found in the SECURIX System to issue notices for the CITY if desired, at no additional service charge per vehicle for each notice issued. A Final Notice, if necessary due to lack of payment, or provision of proof of insurance, shall also incur no additional charge. That said, an additional fee of $10. for processing will be added to the amount required for violator to pay in order to cover the substantial additional costs incurred for out-of-state processing.

2.5 COMPANY will ensure that all captured images are provided to the Chief of Police as directed by CITY and will also ensure that all images related specifically to a government-provided record of uninsured vehicles, will be provided to the designated Law Enforcement officer(s) who will review and determine if a violation regarding vehicle insurance has occurred. Images depicting clearly established violations along with government data supports of proof, will be transmitted by Officer(s) to COMPANY for further confirmations by State-licensed vehicle insurers for notice preparation, mailing and collections. All decisions regarding probable cause are determined by law enforcement personnel only who have no access to names or addresses in doing so. Parties agree that it is essential that no possible privacy violation is to tolerated so as to meet all DPPA and other privacy protection laws and guidelines.

2.6 COMPANY agrees to provide a secure website (www.seeyournotice.com) accessible to vehicle owners who receive notices or citations by means of number and PIN printed on same, to review the violation image and either request a court appearance, show proof of insurance or, pay a diversion fee. COMPANY will provide easy payment options including online payment but also in person at court on the dates in those court facilities assigned or, by telephone with a debit or credit card. All payments of all types will go always and only into the sole Certified Payments system for daily distribution and accounting to the Parties, as described in section 4. Unless instructed otherwise, COMPANY will seek to accommodate violators by any reasonable means, including the acceptance of payments over time and monitoring and reporting of same.

2.7 COMPANY will provide a help-line, available during normal business hours, to assist vehicle owners and to answer any questions about the program, their notice or citation and payment options. A specialized CSR, (Citizens' Service Representative), will also be available to interface with the CITY and other Governmental entities for questions relating to system operations. That said, once in operation, such needs are not anticipated.

2.8 CITY will receive standard system reports daily and automatically, Wild Card Reports by use of its Gate Keeper Access and other reports will be enabled by COMPANY for CITY and any others as directed by CITY will be provided without cost to CITY.

2.9 COMPANY's designated media team will assist CITY with public information and outreach campaign strategies. Each Party agrees to submit proposed advertising, promotional or public service materials to the other for review and approval. Reviews will be completed within 7 business days and approvals will not be unreasonably withheld by either party. If there is no documented request for changes within that period, agreement will have been assumed but an acknowledgement of same must be provided within 2 business days prior to proceeding.

2.10 SERVICE LEVEL COMMITMENT:

a. UPTIME. COMPANY is committed to providing the Service in a consistent and reliable manner. COMPANY Solutions will provide the Service to Client with a stated minimum uptime of 99.5% to Client.

b. SCHEDULED MAINTENANCE. COMPANY periodically performs scheduled maintenance including but not limited to outline, preventative or emergency maintenance of the Software and/ or Service. CITY understands that schedule maintenance may affect availability of the Service and/or Software. If scheduled maintenance is to be performed, COMPANY will provide notice to CITY three (3) days prior to such scheduled maintenance. CITY will make every effort to schedule maintenance outside of normal business hours of the client between the hours of ten (10) p.m. and five (5) a.m. Central Standard Time.

c. AUDITS AND SECURITY. COMPANY is committed to maintaining the security of CITY Content, Confidential Information, and Software on COMPANY Service. COMPANY will maintain the Service in a secure manner subject to the Customer Obligations outlined below. COMPANY will perform annual security audits of the Service to ensure the integrity and security of the Service. Results of the Audits and Security Policy for COMPANY Solution s will be made available to CITY upon written request.

d. DATA TRANSMISSION. COMPANY Solutions ensures that all data transmitted to and from the Service is

transmitted at a minimum level of 128-bit SSL encryption using digital certificates issued by an internationally-recognized domain registrar and certificate authority.

e. COMPANY will maintain the Service in a SAS 70/SSAE 16 certified and OIS compliant data facility.

## EXHIBIT C: SCOPE OF WORK – CITY

### 1. GENERAL CITY IMPLEMENTION REQUIREMENTS

Within 7 business days of the effective date of this Agreement, the CITY shall provide the COMPANY with the name, title, mailing address email address and phone number of:

- The project manager with authority to coordinate CITY responsibilities under this Agreement
- All relevant Law Enforcement contact(s) including,
  - o The IT person for Police Chief

1.1 COMPANY shall visit CITY and Parties shall create and agree on a Project Timeline within ten (10) days of the effective date of this Agreement and within 15 days of the completed feasibility and commercial viability analysis of sites proposed on the Notice to Proceed. Project timeline will include a Process Work Flow showing: priority, timing and the order in which selected sites will initially become operational.

1.2 CITY shall approve or reject COMPANY's submitted plans with seven (7) days of receipt and shall limit iterations to one revision beyond initially submitted plans. Total plan approval shall not exceed twenty, (20) business days.

1.3 CITY is responsible to assist in obtaining both electrical provider and DOT approvals prior to installation of equipment if and where necessary and shall allow access to existing power sources at installation sites at no charge to COMPANY. COMPANY shall however, pay all fees and costs and seek alternatives to DOT sites in conjunction with CITY.

1.4 CITY shall add a SIM card for each site to Chief's existing unlimited communications contract for support of its operations supported by COMPANY.

1.5 Once project Timeline is established, Parties will make every effort to adhere to the timeline and not cause undue delays.

1.6 CITY recognizes the substantial upfront cost that the COMPANY will incur to install the System and therefore will not issue a stop-order or otherwise stop construction or operation during the duration of the contract, unless by mutual agreement or by documented failure of COMPANY as detailed herein.

1.7 If CITY chooses to move a system element to a new location after initial installation, it shall first issue a Change Order Notice and within no more than five workdays, COMPANY shall respond with a Change Order Proposal. If in the mutual best interests of the Parties, COMPANY will try to accommodate the request of CITY without charge. If not, the Parties will negotiate in good faith to decide if the move is necessary and what costs might be involved prior to making and then documenting a final decision and informing CITY.

## 2. ENFORCEMENT OPERATIONS

2.1 Police Chief will review and approve standard Notice Form and/or Citation Form and agree that an Officer will provide electronic signature for use, within seven business days of submission from COMPANY.

2.2 CITY Attorney will then review and approve standard Final Notice and/or Citation Form within seven business days of submission from COMPANY.

2.3 Chief will assist in identifying "high traffic count" roadways and other possible sites for system deployment within the jurisdiction for possible inclusion on the Notice to Proceed, provided by COMPANY and if feasible and commercially viable, inclusion of same in the Project Timeline, based on DOT traffic count documents provided by COMPANY as attachment to Agreement.

2.4 CITY will provide letter of authority to provide verification to the appropriate authority that the COMPANY is acting as an agent of the CITY for the purposes of accessing vehicle ownership data pursuant to the list of permissible uses delineated in the Driver's Privacy Protection Act 18 U.S.C. 2721, Section (b) (1) and as may otherwise be provided or required by any provision of applicable state law. This use is limited to creating mailing and contact lists only and only once probable cause has been determined by law enforcement which has no access to such data. Likewise, use of such data by staff is limited to recorded approvals from violators for such use.

2.5 Police and/or Sheriff's Department will ensure that its daily or weekly recipient of the "NO INSURANCE HOT LIST" is made available. COMPANY will provide CITY with parsing routine so that only license plate numbers with matching VINs of known uninsured vehicles are transferred to COMPANY and available. It is essential that no personal data is accessed by anyone involved prior to determination of probable cause by a law enforcement officer.

2.6 The System, when properly deployed, has proven to be an invaluable resource for detection and identification involving both non-compliant and criminal conduct-connected vehicles. COMPANY is aware that CITY already has all required data sources for crime reduction other than uninsured vehicle data but will assist CITY in any manner reasonably requested to help secure all available Hot Lists, BOLO, Amber & Silver alerts etc., and CITY authorizes COMPANY to help secure such data on its behalf in order to link and provide such notices if and as may be required. If there is a detection involving something other than a "No Insurance" alert, it will be immediately transmitted to the CITY, who will maintain all records of the contact/event and proceed at its sole discretion. CITY has no responsibility to COMPANY to disclose details of actions then taken but shall cooperate with COMPANY and provide reasonable assistance to develop positive press releases describing results just as COMPANY will also assist CITY to ensure positive press regarding uninsured vehicle detection and results once approved for release by CITY.

2.7 Designated Law Enforcement officers will process each potential violation in accordance with state law using the System to determine which violations will be forwarded for processing as Notices.

2.8 CITY agrees to enforce the law with all offenders identified by the System and verified by a sworn officer without prejudice or favoritism of any kind. That said, CITY has insight regarding certain conditions that COMPANY does not and may occasionally dismiss a notice. In such instances, it has no responsibility to explain its reasons of doing so to COMPANY.

2.9   CITY alone decides if an outside collections agency is to be used.  If so, none of the additional collection fee obtained by such an agency will be provided to COMPANY but COMPANY will however, use its best efforts to support CITY by interfacing and supporting such outside collection agency efforts. If COMPANY is to be assigned such task instead, details regarding same are provided elsewhere in this agreement. COMPANY acknowledges that failures to pay shall not be shared for public dissemination or be provided to credit reporting agencies.

## 3. PROSECUTOR / COURT OPERATIONS.

3.1   While very little involvement by a Prosecutor is required, CITY will establish arraignment/court dates for the adjudication of this program. There should be one such date monthly.  CITY shall advise COMPANY of the schedule at least sixty (60) days in advance so that COMPANY can assign non-compliant vehicle owners a date that is thirty to sixty (30-60) days from the mailing date at the time that their notice is printed, and schedule COMPANY staff to attend in support of CITY.

3.2   Offenders will have approximately 30-60 days from the time Notice or Citation is mailed to:

- Pay or make agreed arrangements for payment over time and honor agreed schedule
- Produce proof of insurance if any, dated prior to time vehicle was identified
- Produce proof that vehicle was sold or reported stolen prior to time vehicle was identified
- Appear in court
- Otherwise satisfy terms of the Notice
- Either provide proof of current insurance or acknowledge that she/he will ensure that vehicle will no longer be operated uninsured on public roads

3.3   Noting that elsewhere, few violators actually appear at court and almost none then that do, fail to pay so as to avoid prosecution, if a violator fails to (A) Pay the notice prior to the court date, or (B) Appears in court to contest the notice on the date noted on the notice, or (C) contacts the COMPANY or Prosecutor to request a new court date to contest the notice.

Note that this may not be listed as a conviction and the driving license and vehicle registration of the vehicle owner may not be suspended if it has not already been so suspended by DMV.  Instead, those privileges may only be "flagged" to ensure that this matter must be dealt with prior to any renewal of driving or registration privileges.  In the event a violator is licensed outside of the State, then COMPANY will organize and provide to Judicial District all forms and information required so that within ten (10) days and using documents and evidence provided by COMPANY notification can be made to the violator's governing jurisdiction's Office of Motor Vehicles or other agency of that State maintaining data regarding vehicle insurance via NRVC, (Non-Resident Violator Compact and/or AAMVANet, (the national motor vehicle administration network), just as is routinely done now.

3.4   Parties acknowledge that should there be any conviction regarding a charge of no insurance, COMPANY may assist DMV or other agencies to notify the appropriate tax authorities to implement suspension of payment regarding tax returns and other financial benefits in support of the registration and driving license holds for non-payment of fines resulting from this program. COMPANY shall coordinate and administer the process for CITY as CITY decides and directs.

3.5   If violator goes to court and adjudication occurs there, COMPANY is not entitled to and shall not be paid its fixed sum of the original Notice fee or Citation or, be paid any additional share of revenues.

The COMPANY will deploy the SECURIX Motor Vehicle Compliance System in optimum, mutually-agreed locations within the Jurisdiction. The list below is the agreed goal but may change as mutually discussed, agreed and documented among the Parties.

Once executed, this Exhibit shall serve as Notice to Proceed (NTP). With documents prepared and provided by COMPANY, CITY will apply for any/all necessary permits and permissions immediately, but such forms will be provided to CITY by COMPANY as part of its obligations and COMPANY will also monitor and work with DOT and other parties to help ensure approvals. Installation will start as soon as necessary permissions and/or permits are obtained. Those units highlighted are Phase One; others are Phase Two.

It is agreed among the Parties that the first action will be to repair and where necessary and agreed, replace current systems as may be listed in Exhibit "A", and wherever financially feasible COMPANY will immediately also take-over costs for such maintenance, repairs and updates as they become necessary or replace same.

| Name/Designation of CITY Mobile or Fixed Location | Address | AADT in k | Type of site (A, B, C) | Cameras Required (Note Which Type) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Name/Designation of COMPANY-Provided Unit | Address | AADT in k | Type of site (A, B, C) | Cameras Required (Note Which Type) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| 12 each | Type B, Fixed | | | |
|---------|---------------|--|--|--|
| | | | | |
| | | | | |
| | | | | |

**Total of 12 Cameras. Sites: Type "A"-** Mobile System mounted on a LE vehicle, **Type "B"-** Fixed pole or other fixed location-mounted site, **Type "C" –** Post mounted unit or trailer

Agreed by the COMPANY:

Name: ___Jonthaan Ner_____

Signed _____

Date _5/27/2021_____

Agreed by the CITY:

Name: __Shea Dobson_____

Signed _____

Date __5/27/2021_____

**NOTICE: THE TERMS OF THIS CONTRACT ARE NOT BINDING PRIOR TO A STATEMENT OF WORK BEING PROVIDED BY COMPANY AND SIGNED ACCEPTANCE OF SAME BY CITY.**

**WHAT FOLLOWS ARE MAPS FOR PLANNING PURPOSES FOLLOWED BY TRAFFIC COUNTS:**











There appears to be only one MDOT Traffic cam in Ocean Springs. At the intersection of US 90, it has three actual units pointing North, East and West.

There is also a UNO-provided subscription system of ALPR but that will not be linked-to and SECURIX will instead, implement a stand-alone system that will fully support alerts and all other requirements typical of public safety use but also and most specifically, support the identification of and an enforcement system regarding.... Uninsured vehicles.